UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STACEY VANWINKLE and DEREK VANWINKLE, *on behalf of MV and AV, their minor children*, and PAUL GRESK, *Trustee for the Bankruptcy Estate of Derek VanWinkle and Stacey VanWinkle*, | ) ) ) ) ) | |
| | ) | No. 1:15-cv-01082-JMS-MJD |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| SEANNA NICHOLS, MONIQUE MILLER, PEGGY SURBEY, and MARIBRYAN MCGENEY, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Stacey and Derek VanWinkle have two daughters, MV who was born in 1999 and AV who was born in 2001. In November of 2012 and June of 2013, the Indiana Department of Child Services ("DCS") received calls to its hotline in which the callers alleged that Stacey VanWinkle was mistreating MV and AV. After an investigation which included two care conferences with several medical providers, DCS employees, and others, MV and AV were removed from the VanWinkle home. Two days after their removal, the Marion Superior Court found that the removal of MV and AV was necessary to protect them. Twenty-three days later, MV and AV were returned to their parents pursuant to a Marion Superior Court Order. Nearly two years later, this lawsuit followed in which Plaintiffs allege that various constitutional rights were violated. Presently pending before the Court, and ripe for decision, is a Motion for Summary Judgment filed by Defendants Seanna Nichols, Monique Miller, Peggy Surbey, and Maribryan McGeney, who are all DCS employees (the "State Defendants"). [Filing No. 120.]

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

## II.
### STATEMENT OF FACTS[1]

**A.  AV's Health**

AV's long medical history began when she was an infant.  For example, AV had several gastrointestinal issues beginning in infancy, including difficulty keeping formula and baby food down, followed by nausea and vomiting as she got older.  [Filing No. 138-6 at 4-5.]  AV's gastrointestinal issues were confirmed by several medical tests, and witnessed by her parents, her sister, her in-home tutor, her in-home nurse, school officials, and her grandparents.  [*See* Filing No. 138-7 at 4-5; Filing No. 138-8 at 6-7; Filing No. 138-9; Filing No. 138-10 at 5-7; Filing No. 137-12; Filing No. 137-13; Filing No. 137-15 through Filing No. 137-17.]

In December of 2007, Dr. Brian Hainline, a biochemical geneticist and pediatrician at Riley Hospital, diagnosed AV with a mitochondrial-like disorder described as a neuromuscular disease or myopathy of unknown etiology.  [Filing No. 138-11 at 27-29.]  AV's disorder is complex and difficult to explain to patients and even to other physicians.  [Filing No. 138-11 at 12-15.]  Dr. Hainline felt the term "mitochondrial disorder" accurately described AV's condition, and encouraged the VanWinkles to use that term when describing her diagnosis to other physicians or to the school.  [Filing No. 138-11 at 62-65.]

Also in 2007, Dr. Joel Boaz performed surgery on AV for an Arnold Chiari Malformation, a condition where "the cerebellum…, which should stop at the base of the skull, extends further

---

[1] Plaintiffs cited to numerous exhibits that were filed in redacted form, and then later filed unredacted and under seal.  The Court would normally cite to the unsealed, redacted versions of exhibits where possible.  However, in many instances the "redacted" version filed by Plaintiffs is completely redacted. For example, Plaintiffs first filed excerpts from the deposition of Dr. Bryan Hainline in "redacted" form with their response brief.  However, this "redacted" version is simply eighty-nine pages of completely redacted text.  [*See* Filing No. 144.]  Accordingly, the Court has cited to the sealed versions of exhibits that were redacted in their entirety, as a review of the redacted version would be of no assistance to the reader.

than it is intended to and goes down into the spinal canal." [Filing No. 143-2 at 7; Filing No. 143-2 at 12.] The surgery also involved a tethered cord release, spinal taps, and placement of a spinal shunt to relieve spinal and intracranial pressure. [Filing No. 143-2 at 6-9.] In 2010, AV complained of headaches which Dr. Boaz attributed to increased spinal and intracranial pressure. [Filing No. 143-2 at 25-26.]

**B. Initial Concerns Regarding AV's Care**

In 2012, some of AV's doctors became concerned that her symptoms were being over-reported or that the reported symptoms were not consistent with what was being observed by her doctors during appointments. [Filing No. 121-6 at 5.] Dr. Shannon Coffey Thompson was a physician at Peyton Manning Children's Hospital at the time, and on November 27, 2012, at her direction, a hotline call was made to DCS and a Preliminary Report of Child Abuse or Neglect was filed regarding AV. [Filing No. 121-5 at 4-6; Filing No. 138-1.] The Preliminary Report of Child Abuse or Neglect indicated:

> Is Child In Imminent Danger of Serious Bodily Harm? No
>
> Allegation Narrative:
>
> This incident occurred in Marion County.
>
> RS [(Reporting Source)] reports that [AV] and sibling reside with their mother, Stacey Vanwinkle (sic), and father, Derek Vanwinkle….
>
> RS reports that [AV] has been suffering from multiple medical issues and conditions, since birth. RS reports that Mr. and Mrs. Vanwinkle have sought medical attention for the issues and conditions, but Mr. and Mrs. Vanwinkle do not always follow up with the appropriate medical treatments or follow the doctor's medical recommendations. RS reports that this medical neglect causes new medical issues and problems for [AV]. RS reports that this is an ongoing problem that the doctors and the hospital have been dealing with for years. RS reports that the doctors are having a hard time helping [AV] when Mr. and Mrs. Vanwinkle do not follow up with the treatments and recommendations as needed.

RS reports that Mr. and Mrs. Vanwinkle will also request extreme procedures from the doctors. RS reports that…Mr. and Mrs. Vanwinkle have requested a G tube for feeding, due to [AV's] current weight problems. RS reports that Mr. and Mrs. Vanwinkle have also requested the doctor's [sic] to perform a Tracheotomy on [AV] due to the respiratory issues that [AV] is currently suffering from. RS reports that both of these procedures are invasive and are medically unnecessary at this point.

RS reports that [AV's] doctors at Riley's and St. Vincent both have great concerns for the wellbeing and the safety of…[AV]. RS reports that there is going to be a medical case conference at St. Vincent's Hospital on 11/29/2012, at 1200. RS reports that the doctors and nurses are requesting that the DCS caseworker attend the meeting before making any contact with the family.

RS reports that [AV] is not currently in the hospital.

RS reports they are unaware of information regarding the parent's violent tendencies, mental health, criminal history, or DCS history….

[Filing No. 138-1 at 1.]

### C.  The November 29, 2012 Care Conference

As the Preliminary Report of Child Abuse or Neglect reflects, a Care Conference to discuss AV's case was planned for November 29, 2012.  [Filing No. 121-5 at 6; Filing No. 138-1 at 1.] The Care Conference was attended by Dr. Susan Maisel, DCS representatives, and representatives from the Child Protection Team at Peyton Manning Children's Hospital ("CPT"), and the goal was to "come up with [the] best plan of action to appropriately evaluate this extremely complicated case." [Filing No. 121-5 at 6.]  At the conference, Dr. Maisel, who had been treating AV since she was a toddler, expressed concern that the VanWinkles were over-reporting AV's symptoms. [Filing No. 121-6 at 11.]  Specifically, Dr. Maisel was concerned that AV's significant weight gain in under a year was not consistent with the symptoms the VanWinkles had been reporting such as excessive vomiting, loss of appetite, and recorded food intake.  [Filing No. 121-6 at 11; Filing No. 121-6 at 23.]  Dr. Maisel also noted that AV was quiet during appointments and took all verbal cues from her mother, and that Stacey VanWinkle was adamant that AV remain on a feeding tube

when Dr. Maisel raised the possibility of getting rid of it.  [Filing No. 121-6 at 24-25.]  No action

was taken by DCS based on the November 29, 2012 care conference.  After the care conference,

DCS employee Corey Miller asked DCS employee Austin Hollabaugh in an email whether he

knew why the report from the November hotline call was withdrawn.  [Filing No. 138-2 at 57.]

Mr. Hollabaugh replied "It's probably the one that I took Zmich out on with me…I withdrew it

after we met them because they didn't have a case."  [Filing No. 138-2 at 57.]

Dr. Maisel's concerns continued after the November care conference.  [Filing No. 121-6 at

26.]  Dr. Thompson also had concerns, but her concerns related mainly to the VanWinkles'

reporting of AV's issues with breathing and obstructive airway symptoms, and reports from two

other doctors that the VanWinkles were pushing for AV to get a tracheostomy when it was not

indicated.  [Filing No. 121-5 at 15.]

**D.  Dr. Demetris Takes Over AV's Care**

In May of 2013, Dr. Cortney Demetris took over the medical investigation of AV's case.

[Filing No. 121-3 at 5.]  As part of that investigation, Dr. Demetris:

> reviewed medical records from the St. Vincent or Peyton Manning Children's
> Hospital pulmonology office, the GI office, the ENT office.  [She] reviewed
> medical records from Riley Hospital metabolic pulmonology, some inpatient
> records from Riley, urology records from Riley.  Neurology records were
> requested; however, [she] did not receive those.  [She] received records from
> multiple subspecialists at Cincinnati Children's Hospital, including some swallow
> study information, pulmonology, ENT, the genetics….  [S]ome records…from an
> outside hospital, maybe Community Hospital, maybe some records maybe from
> ortho or x-ray type of records.  [She] reviewed records from an orthopedic
> surgeon's office….

[Filing No. 121-3 at 6.]  Dr. Demetris diagnosed AV as a victim of medical child abuse.[2]  [Filing No. 121-3 at 4.]

### E.  AV is Admitted to the Hospital

In June of 2013, AV was admitted to the hospital so that doctors could observe her symptoms.  [Filing No. 37 at 9.]  The symptoms that led to AV being admitted to the hospital included excessive vomiting, ongoing weight gain, ongoing reporting of mitochondrial myopathy without a definitive diagnosis (or a diagnosis of mild mitochondrial myopathy), and that she was in a wheelchair and was not walking.  [Filing No. 121-6 at 54-55.]  Additionally, AV was taking approximately 25-30 medications, and using other, additional medical interventions.  [Filing No. 121-3 at 8.]  AV's hospital stay was videotaped unbeknownst to the VanWinkles, and there were symptoms the VanWinkles had reported that were not observed on video.  [Filing No. 121-3 at 16.]  For example, there were no reports of AV vomiting during her stay.  [Filing No. 121-3 at 17.]  AV was discharged from the hospital on June 12, 2013 to her parents.  [Filing No. 138-12 at 13.]

### F.  The June 12, 2013 Hotline Call

On June 12, 2013, another hotline call was made to DCS, this time at the request of Dr. Demetris.  [Filing No. 138-3.]  A Preliminary Report of Child Abuse or Neglect dated June 12, 2013 states:

Is Child In Imminent Danger of Serious Bodily Harm?  No

Allegation Narrative:

INCIDENT COUNTY:  Marion County

RS states that Stacey and Derek VanWinkle reside….with their children [AV and MV].  Derek is a stay at home parent and Stacey is a registered nurse.

---

[2] Medical child abuse is a term used to refer to a condition formerly called Munchausen Syndrome by Proxy.  [*See* Filing No. 121-3 at 3.]

RS reports that the family does have DCS history. RS states that [AV] has a long list of medical problems and medications.

RS states that [AV] has a very long medical history and it has been questioned over time by several different doctors whether [AV] needs all of the medical treatment and medications that Stacey thinks that she needs. RS states that [AV] is not as sick as Stacey presents her to be. RS states that Stacey takes [AV] to doctors and when the doctors will not do what Stacey thinks that they should do Stacey takes [AV] to another doctor until Stacey finds a doctor that will provide the medical treatment and/or procedure that Stacey wants for [AV].

RS states that [AV] has a feeding tube and Stacey reports that [AV] has been vomiting liters when she is at home. Stacey also reports that [AV] cannot walk across the room without being out of breath and having difficulty breathing. RS states that [AV] has gained about fifty pounds in the past year. RS states that Stacey used the feeding tube to give [AV] her medications which is not necessary.

RS states that [AV] has had several tests regarding her feeding and tolerance issues and all of the test results have been normal. RS states that there is a concern that [AV] is getting too many calories and Stacey reports that if [AV] gains much more weight that she is going to have to have a tracheotomy. RS states that this would be completely unnecessary.

RS state[s] that it is reported that [AV] has motorized wheelchair at home and Stacey will not allow [AV] to go to school. RS states that [AV] has not had any difficulty getting around while at the hospital.

RS states that Dr. Courtney (sic) Demetris, Child Protection Team at Peyton Manning Children's Hospital requested that this information be reported. RS states that there is a concern for medical child abuse. RS states that Stacey has also scheduled a procedure for [MV] and [MV's] doctor has already contacted Dr. Demetris with concerns that the procedure is not something that is medically necessary.

[Filing No. 138-3 at 1-2.]

## G. The June 17, 2013 Care Conference

On June 17, 2013, the following individuals attended a second Care Conference related to

AV: Seanna Nichols, Sheila Day, Dr. Cortney Demetris, Dr. Susan Maisel, Dr. Bryan Hainline,

Dr. Ronda Hamaker, Dr. Roberta Hibbard, Monique Miller, Corey Miller, Maribryan McGeney,

Kate Peterson, Patrick Rhodes, Indianapolis Metropolitan Police Department ("IMPD") Detective

9

Justin Hickman, Detective Shawn Looper, Richard Rink, Occupational Therapist Kristen Harris, Physical Therapist Erica Klene, Dr. Rachael Meadows, and Dr. Raminder Sufi. [Filing No. 138-4 at 12.] The following are notes from the June 17, 2013 Care Conference[3]:

> On 6/17/2013, a case conference was held at Peyton Manning Children's Hospital, including numerous physicians, medical providers, and other pertinent individuals involved in care for both [MV and AV]. Many physicians were interviewed via teleconference, while others presented at the meeting in person. [IMPD] Child Abuse Unit was present by two detectives, as well as multiple representatives from [DCS]. Both Peyton Manning Child Protection Team and Riley Hospital Child Protection Team, including a Board Certified Child Abuse Pediatrician, were present for the duration [of] the meeting.

> On 6/17/2013, Dr. Rhonda Haymaker (sic), Otolaryngologist with Peyton Manning Children's Hospital and medical provider for both [MV and AV], reported that most recently, her clinic has compared notes with pulmonology, gastroenterology, and all departments received different accounts of symptoms and different familial histories, both crucial to appropriate diagnostic practices. Dr. Haymaker (sic) stated that after holding a small conference of physicians, it has been documented that Ms. Vanwinkle is splitting care for her children between offices, often giving false information regarding other physicians and their recommendations. Dr. Haymaker (sic) stated that after reviewing [AV's] chart, there are concern[s] that long-term appropriate care has been sought for the child, and now, her sibling. [Omitted as disputed]. Dr. Haymaker (sic) stated that [MV's] respiratory issues, while mild, were of great concern to Ms. Vanwinkle; Dr. Haymaker (sic) reported that many of [MV's] symptoms, reported by mother, did not make sense with the child's clinical presentation. Dr. Haymaker (sic) stated that while the child has a larger basal tonsil, less invasive options were proposed to Ms. Vanwinkle. [Omitted as disputed]. Dr. Haymaker (sic) reported that Ms. Vanwinkle stated that she could be going to Cincinnati to have the child evaluated, despite the office's findings. [Omitted as disputed]. Dr. Haymaker (sic) stated that [AV] received her lingual tonsillectomy at Cincinnati Children's Hospital in October 2012, and now, Ms. Vanwinkle is seeking the same procedure for [MV]. Dr. Haymaker (sic) reported that mother has reported all of the child's symptoms in the office. Dr. Haymaker (sic) stated that Ms. Vanwinkle has also attributed both children to mitochondrial disorder, and continues to report she is seeking treatment for the children for this disorder in Cincinnati. Dr. Haymaker (sic) stated that despite being fourteen years old, she was concerned that when [MV] presented for minor testing, such as scoping, she cried uncontrollably and was inconsolable in the office. Dr. Haymaker (sic) stated that in a younger child, this may be less concerning, but it

---

[3] The Court has omitted from its quotation of the Care Conference notes certain statements that Plaintiffs dispute. The Court notes, however, that Plaintiffs have introduced no evidence to dispute the truth of the remaining statements, or that they were made at the Care Conference.

was unsettling to observe in an older child. Dr. Haymaker (sic) stated that [MV] is scheduled for evaluation on her birthday, and when this was discussed with mother, she became defens[ive] and irate, stating "don't you think I know when my child's birthday is?" Dr. Haymaker (sic) stated that Ms. Vanwinkle has previously made requests for a tracheostomy, to which she was denied, both at Riley Hospital and Peyton Manning.

On 6/17/2013, Kristen Harris, Occupational Therapist, was present in person at the meeting. Ms. Harris reported that when she came to evaluate [AV] during her inpatient stay last week, [AV] was awake in the playroom with her sister, playing a board game, and Ms. Vanwinkle was not present. Ms. Harris stated that her main assessment, functions include fine motor and self-help/hygiene skills. Ms. Harris stated that she spoke with [AV] concerning these skills, and the child reported being able to dress, bath[e], and complete toileting independently. Ms. Harris stated that when describing her showering habits, [AV] stated she stands, without loss of balance, and is able to complete her showers independently. Ms. Harris reported that she spent approximately forty-five minutes with [AV] for assessment, and denied the child complaining of pain or fatigue at any time during the assessment. Ms. Harris reported that the child reported that she has broken her arm six times, despite previous records that there was only one fracture. Ms. Harris reported that [AV] completed functional skills, such as fasteners, with no difficulty, and was able to maneuver standing on a tipping plank while throwing a ball at a target, and maintaining balance while distracted. Ms. Harris stated that [AV] was able to complete this activity for approximately three minutes with no support and no loss of balance. Ms. Harris reported that she was not present when Ms. Vanwinkle discovered [AV] had been assessed, but was informed that Ms. Vanwinkle denied much of the report and [AV's] capabilities, wanting the report amended by the hospital. Ms. Harris reported that after her evaluation, the recommendation she would make is acute inpatient during the child's hospital stay, and outpatient follow up for the child's handwriting, which was illegible. Ms. Harris denied any concerns for self-care fine motor skills at this time based upon her assessment with the child.

On 6/17/2013, Erica Klene, Physical Therapist, was present in person at the meeting. Ms. Klene stated that she attempted to complete an evaluation with the child twice while in the hospital last week during her scheduled inpatient stay, and both times, mother immediately told her that [AV] has autism and would not speak with her. Ms. Klene reported concerns that mother would not allow [AV] to be evaluated without first making an excuse for her lack of participation. Ms. Klene stated that both parents were present for her ultimate evaluation with the child, where [AV] walked for approximately 300 feet with no support and no loss of balance. Ms. Klene reported that Ms. Vanwinkle stated the child uses a wheelchair, and stated the child must have had a "good day," and intimated the child's physical ability is far less than she demonstrated that day, even after observing the child stand on each leg, alternatively, with no swaying and no balance issues. Ms. Klene stated the child was slightly out of breath following the therapy evaluation, but would attribute this, based on her observation, to the child's deconditioned status.

Ms. Klene stated that Ms. Vanwinkle reported history to her including previous leg braces for the child. Ms. Klene stated that when she attempted to gather more information as to why the child no longer wore braces, Ms. Vanwinkle stated the child outgrew them. Ms. Klene reported that she asked mother if/when she pursued to have the child fitted again for braces, to which Ms. Vanwinkle denied further evaluation. Ms. Klene denied [AV] expressing symptoms of pain or fatigue during the evaluation. Ms. Klene reported that she attempted to gather more information from Ms. Vanwinkle about the alleged falls and other concerning mobility issues that the parents reported for [AV], but Ms. Vanwinkle was unable to provide specifics on occurrences, situations, and other necessary details. Ms. Klene stated that [AV] never answered questions during the evaluation, but rather, looked to her mother when she answered on the child's behalf. Ms. Klene reported that her recommendation following the assessment would include thirty minutes of physical activity five times a week.

On 6/17/2013, Dr. Demetris reported that she has spoken with Dr. Richard Rink, pediatric Urologist with Riley Hospital, and provider for [AV]. Dr. Rink was currently out of the country, and only available by phone. Dr. Rink reported that there are no objective test results that show the child has bladder dysfunction, despite receiving weekly bladder baths in NaCl and [catheterization] four times a day by a caregiver. Dr. Rink stated that it was agreed among providers that with [catheterization] four times a day, this would greatly increase the risk for urinary tract infections, from which the child suffers on a regular basis. Dr. Demetris informed Dr. Rink that while on video feed, [AV] was observed only to have 20 mL post-residual urine, which is far less than reported by mother.

On 6/17/2013, Dr. Raminder Sufi, Pulmonologist with Peyton Manning Children's Hospital and medical provider for [AV], was present in person for the meeting. Dr. Sufi stated [AV] was his patient until March 2012; at this time, Dr. Sufi completed a "six minute walk test," which is often referenced as a diagnostic tool to distinguish whether or not an individual is disabled. Dr. Sufi stated when he administered this test to [AV], she walked 1600 feet, and approximately twelve minutes of walking with no support and no loss of balance. Dr. Sufi stated that this performance directly opposed all reported symptoms by [AV's] parents, who stated the child could only walk from the bed to the couch, and back, resulting in shortness of breath and pulmonary strain. Dr. Sufi stated that on a scale of exertion, [AV] scaled a seven out of 10 (7/10), showing she is deconditioned, not unable to complete the task. Dr. Sufi stated that a respiratory therapist was present for the duration of the testing to observe and monitor the child's condition; following the test, a detailed exercise plan was created, day to day, for the child. Dr. Sufi stated the family reported they completed the plan, but it is unknown who monitored the completion. Dr. Sufi stated that [AV's] respiratory issues, at this time, are directly related to her obesity; he reported that after a Pulmonary Function Test (PFT), there was no evidence [of] any restrictive lung disease, cough levels were normal, and inspiration ability was normal; Dr. Sufi stated that if the child were suffering from organic respiratory issues, one of these factors would appear abnormal on testing. Dr. Sufi

stated that after testing, the BiPAP machine was not considered necessary; when discussing this with the family, Dr. Sufi was informed by the family that they believed the machine was, in fact, necessary, and would continue to use it, despite the physician's recommendation. Dr. Sufi stated that following the test, he scheduled a sleep study for [AV] to establish a baseline for the child. Dr. Sufi stated that when Ms. Vanwinkle brought [AV] to the study, and it was requested to complete the sleep study without BiPAP support, Ms. Vanwinkle refused, took the child, and failed to complete the study. Dr. Sufi stated that following his dismissal of the need for the BiPAP machine, and the failed sleep study, [AV] has not returned to his office.

On 6/17/2013, Dr. Roberta Hibbard, Board Certified Child Abuse Pediatrician, and physician with Riley Hospital for Children Child Protection Team, was present in person at the meeting. Dr. Hibbard informed FCM that the only way to distinguish [AV's] valid medical needs from the history of exaggerated symptoms and falsified illnesses, would be to isolate the child medically from the influence of her parents, and have the child evaluated by objective physicians, dismissing all previously disclosed history; by reviewing only objective and evident medical date, [AV's] current levels of functioning could be appropriately assessed and only necessary medical interventions continued. Dr. Hibbard reported concerns for both children in the home, as multiple physicians reported similar behaviors by the parents of the children regarding [MV] as well.

On 6/17/2013, Dr. Rachael Meadows, primary care physician associated with Community Health Network, and ongoing primary care for both [MV and AV], was made available to the meeting via teleconference. Dr. Meadows stated that she has provided medical care for both [MV and AV]. Dr. Meadows stated that she believes the parents of these children are seeking medically inappropriate care, especially for [AV]. Dr. Meadows reported that when [AV] first came to her office in August 2011, she was prescribed seventeen medications. Dr. Meadows stated that she has seen [AV] multiple times, and all appointments were for concerns and symptoms reported, but not present in the clinic, other than general coughs. Dr. Meadows stated that despite numerous complaints, she has not observed presentation of symptoms reported by Ms. Vanwinkle on behalf of [AV]. Dr. Meadows stated that the most common complaint for the child was chronic and debilitating fatigue. Dr. Meadows reported that the child suffers from constant Urinary Tract Infections (UTIs), which may be exacerbated by the constant [catheterization] the child receives. Dr. Meadows stated that [AV], to her knowledge, has not attended school since Fall of 2012, pursuant to bullying. Dr. Meadows stated that mother has also reported the child cannot attend school due to immune issues, and varies on the excuses given for the child being home-bound. Dr. Meadows reported that [AV] transferred to her office, per mother, because Ms. Vanwinkle "did not agree" with the care for [AV] provided by her previous primary care physician. Dr. Meadows reported she had limited medical history, but not a full medical history, nor full medical records for the child, and much of the child's history was given by mother, verbally, in the clinic. Dr. Meadows stated that she

has observed very mild hypotonia, or lack of muscle strength, in [AV] but he feels this can be attributed to the child's deconditioned status, and it does not present significantly. Dr. Meadows stated that Ms. Vanwinkle, when reporting for [AV], will demean the child and discredit anything the child may seem, attributing the child's "confusion" to her autism. Dr. Meadows stated [AV] was diagnosed with autism at age three years of age, but does not have medical documentation to support this. Dr. Meadows reported that if she were to only evaluate [AV] based on objective data and observable symptoms, her only diagnoses at this time would be obesity, and undefined developmental delay. Dr. Meadows reported that she is beginning to see the pattern of exaggerated reporting being with [AV's] older sister, [MV], at this time. It was noted that Ms. Vanwinkle was offered an educational assessment for [AV] most recently, but Ms. Vanwinkle adamantly refused.

On 6/17/2013, Dr. Susan Maizel (sic), Gastroenterologist with St. Vincent Health Network and medical provider for [AV], presented in person at the case conference. Dr. Maizel reported that she has been associated with [AV's] medical care since infancy, when [AV] was diagnosed with eosinophilic esophagitis, which is inflammation of the esophagus and upper digestive tract. Dr. Maizel reported that the esophagitis began to resolve spontaneously around the year 2005. Dr. Maizel reported that there has been no diagnostic evidence since that time of esophagitis. Dr. Maizel reported that [AV] has been found to possess a duplicate ureter, but this would not cause any of the symptoms mother is reporting regarding [AV's] gastroenterology issues. Dr. Maizel reported that no familial history of alleged gastroenterology issues have been made available to her, and all familial history of esophagitis and reflux have been disclosed by mother. Dr. Maizel reported that Ms. Vanwinkle has told her on multiple occasions that [AV] has mitochondrial disorder. Dr. Maizel reported that much testing has been continually conducted on [AV], including stomach emptying studies, and other films, which have revealed no ongoing concerns for the symptoms reported during appointments. Dr. Maizel reported that [AV] has a gastrostomy tube, previously a [gastro-jejunal] tube which diverted past her stomach directly to her small intestine. Dr. Maizel reported that based on reported symptoms by Ms. Vanwinkle, the gastrostomy tube was initiated with [AV], as symptoms reported including feeding issues, vomiting, and nausea. Dr. Maizel denied [AV] disclosing any symptoms, and that largely, history and symptoms are presented by mother. Dr. Maizel reported that [AV] has gained a significant amount of weight in under a year, and is now clinically obese, which contradicts the symptoms reported by both parents, such as excessive vomiting, extreme nausea, loss of appetite, and reported food intake. Dr. Maizel stated that when the parents attend appointments together, they contradict symptoms and histories. Dr. Maizel stated that [AV], in her opinion as a professional, and a medical provider for the child, has been infantilized by her parents, and as a result, is not enrolled in school. Dr. Maizel reported that several times, mother has made excuses for lack of educational involvement, stating on occasions that another provider, specifically Dr. Hainline, reported that [AV] has a compromised immune system, and cannot attend school, which other times, blaming fatigue and the child's alleged mitochondrial disorder. Dr. Maizel stated that when discussing with

mother the possibility of removing the gastrostomy tube, and the child only uses it for medication injections at this time, not for supplementary feeding, which is the primary need for such intervention, Ms. Vanwinkle is adamant the tube remain, as the child has difficulty "taking so much medication by mouth every day." Dr. Maizel reported concerns that [AV] is quiet in appointments, and takes all verbal cues from her mother before speaking. Dr. Maizel agreed that many of the child's symptoms are over reported and intentionally done so, in order to maintain current medical interventions, while seeking more invasive care.

On 6/17/2013, Dr. Bryan Hainline, Metabolic Specialist with Riley Hospital for Children and medical provider for [AV], was made available to the meeting via teleconference. Dr. Hainline reported that he has been working with the VanWinkle family since "almost the beginning" of [AV's] medical care. [Omitted as disputed]. Dr. Hainline reported that there are no specific clinical tests for fatigue, but the child has not appeared severely fatigued during appointments. [Omitted as disputed]. Dr. Hainline reported that the family has been informed multiple times that [AV] does not have mitochondrial disorder, which would only present severely until three to four years of age. Dr. Hainline reported that many times, symptoms of mitochondrial disorder resolve as the child grows; Dr. Hainline reported that despite repeatedly informing the family that [AV] does not have mitochondrial disorder, the parents are continually reporting to other physicians that not only does [AV] have this disorder, diagnosed by Dr. Hainline, but that the condition prevents the child from interacting with others. [Omitted as disputed]. Dr. Hainline reported that he has actually made a clinical recommendation for the opposite, encouraging [AV']s parents to involve her in a least restrictive environment, including a school setting, and only limit activities based on physical limitations. [Omitted as disputed]. Dr. Hainline reported that there is no objective testing and/or testing information for the child, and the history and symptoms reported are only disclosed by Ms. Vanwinkle. [Omitted as disputed]. Dr. Hainline stated that mother's familial history is inconsistent, and medically impossible, as she has reported other family members with mitochondrial disorder, but it was found that the diagnosed cousin does not have this disorder, and this familial medical history was discovered to be falsified.

[Filing No. 138-4 at 12-15.]

Based on the Care Conference – specifically "the determination that after all physicians had expressed concerns for both children regarding a history of ongoing pursuit of unnecessary medical care, that both children were at risk" – the decision was made to remove MV and AV from the VanWinkles' home. [Filing No. 121-7 at 5.]

### H.  MV and AV Are  Removed from the VanWinkles' Home

On June 17, 2013, shortly after the Care Conference had concluded, Ms. Nichols and Ms. Miller removed MV and AV from the VanWinkle home.  [Filing No. 45 at 6.]  They did not have a court order to do so.  [Filing No. 45 at 6.]  DCS placed MV with a foster family for a brief period of time, and then MV was placed in the home of her grandparents.  [Filing No. 143-4 at 10-17.] AV was taken directly to St. Vincent Hospital and remained there until June 24, 2013.  [Filing No. 121-9.]  During AV's hospital stay, her medical team was "able to get rid of more than half of the medications and interventions she was receiving per the list we received."  [Filing No. 121-3 at 9.]

### I.  State Court Proceedings

On June 19, 2013, two days after MV and AV were removed from the VanWinkles' home, the Marion Superior Court held a post-removal detention hearing for MV and AV.  [Filing No. 121-12 at 5 (Order Regarding Children in Need of Services ("CHINS") Initial/Detention Hearing, Cause Nos. 49D091306JC016301 and 49D091306JC016300).]  The VanWinkles appeared at the hearing with counsel, and were given an opportunity to be heard.  [Filing No. 121-12.]  The Marion Superior Court found that the removal of MV and AV from the VanWinkles' home "was necessary to protect" the children, that "remaining in the home would be contrary to the health and welfare" of MV and AV, and that "due to the emergency nature of the situation, no reasonable efforts could be made to prevent removal of [MV and AV] because: of the medical situation involving [AV] and potential medical situation involving [MV]."  [Filing No. 121-12 at 3.]  Based on the Marion Superior Court order, MV was placed with her grandparents and AV remained hospitalized. [Filing No. 121-12 at 11.]  The Court ordered that AV be placed with her grandparents upon her discharge from the hospital, and that Stacey and Derek VanWinkle have supervised visits with the children.  [Filing No. 121-12 at 11-12.]  Pursuant to a subsequent court order, MV and AV were

returned to their parents on July 10, 2013. [Filing No. 45 at 6.] Specifically, the Marion Superior Court ordered that "the children [be] placed back with parents provided parents are compliant with therapy and a safety plan is in effect. In the event a child needs to go to the doctor the court orders someone to go with parents to the doctor." [Filing No. 138-5 at 2.]

**J. The Child Care Worker Assessment Review**

Stacey VanWinkle worked in the field of child care, so DCS conducted a Child Care Worker Assessment Review ("CCWAR") in August of 2013. [Filing No. 45 at 6.] Defendant Peggy Surbey, a DCS employee, conducted the CCWAR review and found that the information that she reviewed indicated by a preponderance of the evidence that the allegations against the VanWinkles were true. [Filing No. 121-4 at 14.] The neglect allegations were substantiated against the VanWinkles in August of 2013, which the VanWinkles appealed. [Filing No. 45 at 6-7.] DCS voluntarily dismissed the CHINS case on October 8, 2013. [Filing No. 45 at 7.]

A different DCS office conducted a CCWAR, and that office also found that the allegations of neglect by Stacey VanWinkle were substantiated. [Filing No. 45 at 7.] Thereafter, an Administrative Law Judge ("ALJ") held a hearing in connection with the VanWinkles' administrative appeal from January 7 to January 17, 2014, where the parties presented testimony. [Filing No. 45 at 7.] The ALJ found that the neglect allegations were unsubstantiated with regard to MV, but were substantiated with respect to AV as to both Stacey and Derek VanWinkle. [Filing No. 45 at 7-8.] Upon judicial review, the ALJ's findings were reversed and the neglect allegations

were found to be unsubstantiated against both Stacey and Derek VanWinkle. [Filing No. 45 at 8.][4]

### K. The Lawsuit

On June 8, 2015, the VanWinkles filed a lawsuit in Marion Superior Court against Dr. Demetris and the State Defendants, asserting a claim for violation of 42 U.S.C. § 1983 against all Defendants and a claim for medical negligence against Dr. Demetris. [Filing No. 3-1 at 33.] The State Defendants removed the case to this Court on July 10, 2015, [Filing No. 3], and Dr. Demetris subsequently moved to dismiss the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), [Filing No. 22]. In lieu of responding to the Motion to Dismiss, the VanWinkles sought and obtained leave to amend their Complaint, and filed the operative Amended Complaint on October 7, 2015, [Filing No. 37].

In the Amended Complaint, the VanWinkles, individually and on behalf of MV and AV, assert a claim for violations of 42 U.S.C. § 1983 against all Defendants.[5] [Filing No. 37.] Specifically, they allege that:

- Ms. Nichols and Ms. Miller violated their[6] Fourth Amendment right to freedom from unreasonable seizure;

---

[4] The reversal of the ALJ's decision was based on the Marion Superior Court's technical finding that DCS had not substantiated allegations of "neglect." The court noted that DCS had not charged the VanWinkles with "abuse," which is governed by a different standard. [See Filing No. 137-31 at 12-18.] In any event, as discussed below, the Marion Superior Court's findings have no preclusive effect in this action.

[5] On April 25, 2016, Paul Gresk, Trustee for the Bankruptcy Estate of Stacey and Derek VanWinkle, moved to substitute himself as the real party in interest for the individual claims of Stacey and Derek VanWinkle, due to their filing for Chapter 7 bankruptcy protection. [Filing No. 84.] The Court granted the motion. [Filing No. 87.] For simplicity, however, the Court will refer to Stacey and Derek VanWinkle as "Plaintiffs" from time to time in this Order.

[6] The Statement of Claims is unclear regarding on whose behalf the Fourth Amendment claim is asserted, but the parties' briefs have clarified that issue as discussed below.

- all Defendants violated their Fourteenth Amendment rights to substantive due process by initially removing MV and AV from the VanWinkle home, continuing to detain them, and substantiating the allegations against them; and

- all Defendants violated their Fourteenth Amendment rights to procedural due process by initially removing MV and AV from the VanWinkle home and substantiating the allegations.

[*See* Filing No. 117 (Plaintiffs' Statement of Claims).][7]

### III.
### DISCUSSION

Defendants set forth five main arguments in support of their Motion for Summary Judgment: (1) that Plaintiffs have lumped all of the Defendants together, and have not established any personal involvement on the part of Peggy Surbey or Maribryan McGeney; (2) that the doctrine of collateral estoppel bars Plaintiffs' claims; (3) that all Defendants are entitled to absolute immunity; (4) that all Defendants are entitled to qualified immunity; and (5) that there are no genuine of issues of material fact and Defendants are entitled to summary judgment on each of Plaintiffs' claims.[8]  The Court will address Defendants' arguments in turn.

### A.  Personal Involvement

Defendants argue that Plaintiffs only discuss the actions of Ms. Nichols specifically, and mention Ms. Miller as being involved in the removal of MV and AV from the VanWinkles' home, but do not directly address Ms. Surbey or Ms. McGeney at all.  [Filing No. 149 at 2-3.] Defendants

---

[7] Dr. Demetris moved to dismiss the Amended Complaint as against her, and the Court granted her motion in a December 18, 2015 Order.  [Filing No. 57.]  Accordingly, the State Defendants are the only remaining defendants in this matter.

[8] Defendants also argue that Plaintiffs' conspiracy claim under § 1983 fails as a matter of law because, among other reasons, their remaining claims only involve DCS employees.  [Filing No. 122 at 29.]  In their response brief, Plaintiffs concede that, in the absence of a non-DCS defendant, their conspiracy claim fails.  [Filing No. 143 at 36.]  The Court agrees, and **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 conspiracy claim.

note that neither Ms. Surbey nor Ms. McGeney were involved in the actual removal. [Filing No. 149 at 3.]

Plaintiffs' claims are rooted in 42 U.S.C. § 1983, which requires a plaintiff to show that they were: (1) deprived of a federal right, privilege, or immunity; (2) by any person acting under color of state law. *Brown v. Butz*, 398 F.3d 904, 908 (7th Cir. 2005). "It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002); *see also Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014); *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[i]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation'") (citation omitted). Because Plaintiffs do not set forth specific allegations connecting Ms. Surbey or Ms. McGeney to the actions that form the basis for their claims – the removal of MV and AV from the VanWinkles' home, the substantiation of neglect, and their continued detention – the Court **GRANTS** summary judgment in favor of Ms. Surbey and Ms. McGeney on all of Plaintiffs' claims.

The Court will consider Defendants' remaining arguments as they apply to Ms. Nichols and Ms. Miller.

### B. Collateral Estoppel

Next, Defendants argue that the Marion Superior Court determined at the June 19, 2013 hearing that removal of MV and AV from the VanWinkle home was "justified by 'emergency' circumstances, which is, 'in essence…exigent circumstances.'" [Filing No. 122 at 34 (quoting *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 485 (7th Cir. 2011)).] Defendants argue that "Plaintiffs[ ] are barred from contesting the seizure, detention, and placement of the children and summary judgment should be entered for the defendants." [Filing No. 122 at 34.]

Plaintiffs argue in response that the application of collateral estoppel requires: "(1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of a party in the prior action." [Filing No. 143 at 36.] Plaintiffs note that the CHINS determination is not a final judgment, and that the determination was later overturned. [Filing No. 143 at 37.]

Defendants do not address the application of collateral estoppel in their reply brief.

"A party is constrained by collateral estoppel as a matter of federal law only where four criteria are satisfied: '(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must [have been] fully represented in the prior action.'" *Grede v. FCStone, LLC*, 867 F.3d 767, 776 (7th Cir. 2017). Here, it is undisputed that the June 19, 2013 order justifying the detention of MV and AV was not final. [*See* Filing No. 122 at 33 (Defendants conceding that "a CHINS determination is not, by itself, a final judgment").] The June 19, 2013 CHINS determination is not entitled to preclusive effect, but is relevant to whether the continued detention of MV and AV was justified – an issue discussed below. The Court **DENIES** Defendants' Motion for Summary Judgment as it relates to their collateral estoppel argument.

## C. Absolute Immunity

Defendants argue that they are entitled to absolute immunity in connection with the care conference, the assessment and resulting report (including any alleged misrepresentations in the report), and their testimony and participation in the administrative and judicial process. [Filing No. 122 at 12.] Defendants point to the Court's earlier decision in this case, in which it found that Dr. Demetris was entitled to absolute immunity for her actions related to the report regarding AV,

her participation in the administrative process, and her participation in the judicial process. [Filing No. 122 at 12-13 (discussing Filing No. 57).] Defendants also contend that they were "acting as arms of the court throughout the proceedings advising on the best interests of the child based on their understanding of the facts," and that "[e]ven if their understanding of those facts as presented to them by Plaintiff's medical care providers was incorrect or misconstrued, they are still entitled to absolute immunity." [Filing No. 122 at 14.] Defendants assert that they are entitled to "quasi-judicial immunity" for decisions made during the administrative process, including substantiation of the allegations against Stacey and Derek VanWinkle and the CCWARS review. [Filing No. 122 at 14-15.]

Plaintiffs argue in response that their claims are not based on the acts of prosecutors and witnesses in court, which are the types of acts to which absolute immunity applies. [Filing No. 143 at 29-30.] They note that none of the Defendants testified in the CHINS proceeding, only Ms. Nichols testified in the ALJ proceeding and, in any event, Plaintiffs "do not complain of any direct act related to [Ms.] Nichols['] testimony during the ALJ proceedings." [Filing No. 143 at 30.] Plaintiffs argue that there is no absolute immunity for the assessment of AV and the resulting report based on case law, and that Ms. Nichols' "Intake Officers' Report of Preliminary Inquiry and Investigation" is not protected. [Filing No. 143 at 30-31.] Plaintiffs also assert that Defendants have not met their burden to show that absolute immunity applies because they have not addressed the six factors for analyzing whether quasi-judicial immunity applies. [Filing No. 143 at 31-32.] They argue that Defendants "do not identify any particular actions that are supposedly immune other than the review of substantiation and the CCWARS review," and that "Plaintiffs do not base their claims on any testimony of the State Defendants to which such immunity would apply." [Filing No. 143 at 31.]

Defendants do not address the application of absolute immunity in their reply brief.

Absolute immunity is of a "'rare and exceptional character,'" and officials who seek to take advantage of absolute immunity bear the burden of "showing that overriding considerations of public policy require that they be exempt from personal liability for their alleged unlawful conduct." *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)). The Seventh Circuit Court of Appeals has recognized absolute immunity for state court judges and prosecutors for acts that are part of their official duties, and for witnesses for their testimony. *Barksdale v. Joyce*, --- Fed. App'x ----, 2017 WL 3776237, *1 (7th Cir. 2017); *see also Doermer v. Callen*, 847 F.3d 522, 530 (7th Cir. 2017) ("immunity doctrines shield certain classes of government defendants from liability for misconduct. Judges, prosecutors, and officials who fill quasi-judicial and quasi-prosecutorial roles are entitled to absolute immunity from damages stemming from many of their official acts, no matter how erroneous or harmful"). Absolute immunity does not extend, however, to acts that are "administrative and investigatory." *Archer v. Chisholm*, --- F.3d ----, 2017 WL 3709149, *5 (7th Cir. 2017). "Protection hinges not on the defendant's job title, but on the nature of the function he performed." *Id.*

Here, while Plaintiffs refer to Ms. Nichols' preparation of the "Intake Officer's Report of Preliminary Inquiry and Investigation," the crux of their claims against Ms. Nichols and Ms. Miller relate to the gathering of evidence to justify MV's and AV's removal from the VanWinkles' home, the actual removal, the substantiation of the allegations, and the continued detention of MV and AV.[9] Ms. Nichols and Ms. Miller are not entitled to absolute immunity for these types of actions.

---

[9] These acts are distinct from the acts of Dr. Demetris about which Plaintiffs complained, which were limited to preparing a report which alleged mistreatment of MV and AV by Stacey VanWinkle, and acting as a witness in the judicial proceedings that followed MV's and AV's

*Finnegan v. Myers*, 2015 WL 5252433, *27 (N.D. Ind. 2015) ("it is undisputed that Defendant McAninch was the only DCS defendant who testified in the CHINS proceedings, and she had a limited role. Rather, when looking at the nature of the function performed by the State Defendants, Plaintiffs point out their numerous allegations of reckless investigatory and out of court actions, which involve factual disputes and have been described in detail by the Court above. These are out of court acts to which the State Defendants are not entitled immunity"); *Millspaugh v. County Dept. of Public Welfare of Wabash County*, 937 F.2d 1172, 1176 (7th Cir. 1991) ("Tucker's application for the order initiating the case, and her journey to Indianapolis to obtain custody of the children, call for different analysis. The application for the initial order was much like a police officer's affidavit seeking a search warrant, which we know…falls outside the scope of absolute immunity. Sallying forth to collect the children is no different from seizing evidence on the authority of a warrant, which again is covered by qualified immunity only…. [A]bsolute immunity does not protect the gathering of evidence, even though the acts of presenting that evidence to (or withholding it from) the court receive greater protection. Social workers must settle for qualified immunity when taking initial custody of the children").

Defendants' Motion for Summary Judgment is **DENIED** to the extent that the Court finds that Ms. Nichols and Ms. Miller are not entitled to absolute immunity.

### D. Qualified Immunity

Next, Defendants argue that qualified immunity bars Plaintiffs' claims. They argue that, when applying a qualified immunity analysis "[i]n the context of child protective decisions, the

---

removal. While Plaintiffs also based their claims against Dr. Demetris on her involvement in the care conference, the Court found that Dr. Demetris had not specifically addressed judicial or witness immunity for that participation, but ultimately found that Plaintiffs' allegations regarding her participation in the care conference were not enough to support a § 1983 claim against Dr. Demetri.

analysis almost always results in immunity for the decision-makers." [Filing No. 122 at 16.] Defendants argue that they reasonably believed that removal of MV and AV from the VanWinkles' home was reasonable, necessary, and lawful, so they did not violate clearly established law. [Filing No. 122 at 16-17.]

Plaintiffs argue in response that Defendants only address the removal of MV and AV from the VanWinkle home in their qualified immunity argument. [Filing No. 143 at 32-33.] Plaintiffs assert that there are genuine issues of material fact which preclude a finding that Defendants did not violate Plaintiffs' constitutional rights, and also contend that Plaintiffs' constitutional rights were clearly established. [Filing No. 143 at 32-36.]

On reply, Defendants argue that "as long as a reasonable 'investigator[ ], supervisor, and manager' could have believed the removal to be lawful, in light of the clearly established law and the information they possessed, the caseworker is entitled to qualified immunity." [Filing No. 149 at 10.] Defendants note that they relied on determinations by medical professionals that both MV and AV were at risk, and that the Marion Superior Court agreed with them, after removal, that removal was necessary to protect MV and AV. [Filing No. 149 at 10.] They argue further that Plaintiffs have not shown that Defendants were on notice that their actions violated Plaintiffs' constitutional rights. [Filing No. 149 at 11.] Defendants contend that "Plaintiffs have failed to show that a DCS employee removing children from a home on allegations of medical child abuse after receiving reports from medical profession[al]s that such children are at risk of harm is a clearly established violation of either the Fourth or Fourteenth Amendment." [Filing No. 149 at 13.]

"Government officials performing discretionary functions enjoy a qualified immunity from suit." *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005). It is "immunity from suit rather than

a mere defense to liability." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis, citation, and quotation marks omitted). "Qualified immunity gives government officials 'the benefit of legal doubts.'" *Rooni v. Biser*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see also Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties"). Its purpose is "to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Once the defense of qualified immunity is raised, 'it becomes the plaintiff's burden to defeat it.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

"To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). The Court may decide these issues in either order. *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). If the right at issue was not clearly established at the time of the violation, the Court may exercise its discretion not to determine whether the defendant violated that plaintiff's constitutional right. *See Pearson*, 555 U.S. at 236 ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

To determine whether a right is clearly established, the Court looks to controlling precedent from both the Supreme Court of the United States and the Seventh Circuit Court of Appeals, and if there is no such precedent it "cast[s] a wider net" and examines "all relevant case law to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013) (quotation and citation omitted). As set forth by the Supreme Court, "a court must ask whether it would have been clear to a reasonable [official] that the alleged conduct 'was unlawful in the situation [she] confronted.' If so, then the defendant [official] must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however – *i.e.*, if a reasonable [official] might not have known for certain that the conduct was unlawful – then the [official] is immune from liability." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1850 (2017) (citation omitted).

> 1.    *Fourth Amendment Claims*

> **a.  Whether the Right Was Clearly Established**

When Ms. Nichols and Ms. Miller removed MV and AV from the VanWinkle home in 2013, the Seventh Circuit Court of Appeals had set forth the standard for determining whether seizure of a child from his or her home without a court order violated the Fourth Amendment. In 2000, the Seventh Circuit decided *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), which involved the removal of a child from his home based on claims that later were determined to be false. The day after he was removed from his home, a court ordered him to remain in foster care. The Court set forth the law regarding the child's Fourth Amendment claim as follows:

> In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers "'have reason to believe that life or limb is in immediate jeopardy.'"

*Id.* at 1010 (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999)).

In 2011, the Seventh Circuit expanded on the definition of probable cause in this context, stating that "[t]he probable cause analysis is an objective one.... Our focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 927 (7th Cir. 2011). Later in 2011, the Seventh Circuit noted in the context of a procedural due process claim related to the removal of a child from his home without a court order that "[w]hen read together, our cases such as *Brokaw* and *Jensen*[ *v. Foley*, 295 F.3d 745 (7th Cir. 2002)], imply that government officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse." *Hernandez*, 657 F.3d at 486. Notably, this is the standard that Defendants set forth in their brief in support of their Motion for Summary Judgment when discussing Plaintiffs' Fourth Amendment claims. [Filing No. 122 at 19.]

Based on clear Seventh Circuit authority, the Court finds that the law regarding when seizure of a child from his or her home without a court order is constitutionally permissible was clearly established at the time that Ms. Nichols and Ms. Miller removed MV and AV from the VanWinkle home. The Court will now address whether constitutional violations occurred.

### b. Whether There Was a Constitutional Violation

#### i. Stacey and Derek VanWinkle

The Court notes at the outset that Plaintiffs' Statement of Claims does not clearly set forth whether all Plaintiffs are asserting a Fourth Amendment claim, or just MV and AV. Defendants argue that Stacey and Derek VanWinkle cannot assert a Fourth Amendment claim because they were not seized. [Filing No. 122 at 18.] Plaintiffs do not appear to contest that point, although do not clarify in their response brief on whose behalf the Fourth Amendment claim is brought.

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A person is "seized" for purposes of the Fourth Amendment "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believe that he was not free to leave." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). It is undisputed that Stacey and Derek VanWinkle were not seized when MV and AV were removed from the VanWinkle home. Therefore, there is no basis for Stacey and Derek VanWinkle to assert a Fourth Amendment claim on their own behalf. And they cannot rely on MV's and AV's seizure to support their own Fourth Amendment claim. *See Hernandez*, 657 F.3d at 480. Defendants' Motion for Summary Judgment is **GRANTED** on any Fourth Amendment claim asserted by Stacey and Derek VanWinkle on their own behalf.

#### ii. MV

MV asserts a Fourth Amendment claim, alleging that removing her from the VanWinkle home was unconstitutional. Defendants argue that MV's Fourth Amendment claim fails as a matter of law, although they focus their argument primarily on AV and merely state that "MV was also in an imminent risk of such abuse." [Filing No. 122 at 21.]

Plaintiffs argue that Defendants have not identified any specific imminent danger of abuse to MV, noting that MV did not have a history of medical treatment like AV did, that the ALJ reversed the finding of child neglect as to MV, and that the only support for their claim of imminency as to MV is a statement in Ms. Nichols' deposition that the decision to remove the children from the VanWinkle home was "based on the determination that after all physicians had expressed concerns for both children regarding a history of ongoing pursuit of unnecessary medical care, that both children were at risk, confirmed by Dr. Hibbard, who reported that both children were at risk if to remain in the home." [Filing No. 143 at 15 (discussing Filing No. 121-7 at 5).] Plaintiffs allege that there is evidence indicating that Ms. Nichols misrepresented what she was told by several physicians. [Filing No. 143 at 15.] Plaintiffs also assert that there is a difference between expressing concerns about a parent exaggerating a child's symptoms and probable cause to believe there is an immediate threat of abuse. [Filing No. 143 at 15.]

On reply, Defendants point to Dr. Hibbard's concerns regarding MV and a report of the VanWinkles seeking an unnecessary procedure for MV, and argue that while Plaintiffs attack the credibility of Ms. Nichols, they do not designate any evidence which contradicts her testimony. Defendants also note that the Marion Superior Court found that there was probable cause to justify the continued removal of both MV and AV. [Filing No. 149 at 6.]

"Because the basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials, the amendment's prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government. Thus, the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees." *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (citations omitted). Defendants concede that both MV

and AV were seized on June 17, 2013, when they were removed from the VanWinkle home. [Filing No. 122 at 19 (Defendants stating "[i]t is undisputed that AV and MV were seized").] The question then becomes whether the seizure was reasonable. *Donovan v. City of Milwaukee*, 17 F.3d 944, 949 (7th Cir. 1994).

As discussed above, the Seventh Circuit Court of Appeals has instructed that, in the context of the removal of a child from her home and family, a seizure is reasonable if: (1) it is pursuant to court order; (2) it is supported by probable cause; or (3) it is "justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy.'" *Brokaw*, 235 F.3d at 1010 (quoting *Tenenbaum*, 193 F.3d at 605). It is undisputed in this case that Defendants did not have a court order when MV and AV were removed from the home. The question then becomes whether the removal was supported by probable cause or exigent circumstances, such as imminency of jeopardy.

The Seventh Circuit Court of Appeals has instructed that, in the context of removing a child from his or her home, "government officials may remove a child from [her] home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse…. It does not suffice for the official to have probable cause merely to believe that the child was abused or neglected, or is in a general danger of future abuse or neglect. The danger must be imminent, or put another way, the circumstances must be exigent." *Hernandez*, 657 F.3d at 486.

As to MV, Defendants point to vague statements from the deposition of Ms. Nichols that physicians had expressed concerns for "both children regarding a history of ongoing pursuit of unnecessary medical care," and that "both children were at risk if to remain in the home." [Filing No. 121-7 at 5.] But the only specific concerns apparent from the evidence were that: (1) Stacey

VanWinkle was seeking out a procedure for MV whereby part of her tongue would be removed for some respiratory problems (a lingual tonsillectomy), "despite a doctor's finding to pursue less invasive options," [Filing No. 121-8 at 2]; (2) when Dr. Rhonda Hamaker, an Otolaryngologist with Peyton Manning Children's Hospital and a medical provider for MV, told Stacey VanWinkle that MV did not need a lingual tonsillectomy but that less invasive options would be beneficial, Stacey VanWinkle "appeared 'sad,'" "asked 'so, we don't have to have this procedure?'" and stated that she would be taking MV to Cincinnati to be evaluated, [Filing No. 12-18 at 21][10]; (3) Dr. Hamaker was concerned that when MV came to the office for "minor testing, such as scoping, she cried uncontrollably, and was inconsolable in the office," [Filing No. 121-8 at 21]; (4) Stacey VanWinkle had previously requested a tracheostomy for MV, but physicians at both Riley Hospital and Peyton Manning Children's Hospital denied her request, [Filing No. 121-8 at 21]; and (5) Dr. Demetris told Ms. Nichols on June 12, 2013 that "she fears [MV] will now become involved in what seems to be a severe case of Medical Child Abuse," [Filing No. 121-8 at 18].

Allegations that Stacey VanWinkle sought a lingual tonsillectomy for MV and stated that she would continue to have MV evaluated for the procedure in Cincinnati, despite at least two physicians advising her that it was unnecessary, are disturbing to be sure. The problem, however, is that Defendants have not presented evidence indicating that MV was in imminent danger. Indeed, there is no indication that Stacey VanWinkle even had an appointment for MV to be evaluated in Cincinnati. The Court finds that, as to MV's removal from the VanWinkle home, there is a genuine issue of fact regarding whether Ms. Nichols and Ms. Miller had probable cause to believe that MV was in imminent danger if she remained in the custody and care of the

---

[10] Plaintiffs dispute that Dr. Hamaker made these statements, [Filing No. 143 at 29], and the Court discusses this factual dispute below in connection with Plaintiffs' procedural due process claim.

VanWinkles, and Defendants' Motion for Summary Judgment as to MV's Fourth Amendment claim is **DENIED**.

        iii.    <u>AV</u>

As to AV, Defendants outline concerns expressed by several of AV's medical providers regarding her well-being, and argue that "a reasonable caseworker [would] have taken action" and "done so immediately." [Filing No. 122 at 21.]

Plaintiffs argue in response that there are genuine issues of fact regarding whether AV was in imminent danger of abuse, and point to reports made to the DCS hotline which both indicated that AV was not in imminent danger of serious bodily harm. [Filing No. 143 at 18.] Plaintiffs also focus on the timing of events, noting that Defendants did not immediately remove AV from the VanWinkle home after the June 12, 2013 hotline call but rather waited another five days to do so. [Filing No. 143 at 19.]

On reply, Defendants again focus on the reports from multiple physicians regarding AV's medical treatment. [Filing No. 149 at 5.] They also rely on the finding in the CHINS proceeding that the removal of AV was "'necessary to protect the children' and that 'due to the emergency nature of the situation, no reasonable efforts could be made to prevent removal.'" [Filing No. 149 at 6 (quoting Filing No. 121-12 at 9).]

There is ample evidence in the record indicating that many of AV's physicians were concerned about the treatment she had received to date, and Stacey VanWinkles' reporting of her symptoms. [*See, e.g.*, Filing No. 138-4 at 12-15 (notes from June 17, 2013 Care Conference indicating that Physical Therapist Erica Klene, Dr. Demetris, Dr. Sufi, Dr. Hibbard, Dr. Meadows, Dr. Maisel, and Dr. Hainline all expressed concern regarding Stacey VanWinkles' reporting of AV's symptoms and AV's medical care to date).] In fact, the Court finds as a matter of law that

Defendants had probable cause to believe that abuse had taken place or would take place, and to investigate the allegations related to AV's care. What is missing, though, is evidence of imminent danger which required her removal from the VanWinkle home without a court order.

Indeed, the timeline reflects that Defendants did not think danger was imminent. The first hotline call to DCS was placed at the direction of Dr. Thompson on November 27, 2012 and, significantly, the report generated after that call indicates that AV was not in imminent danger of serious bodily harm. [Filing No. 138-1 at 1.] Dr. Maisel expressed concerns during a November 29, 2012 Care Conference, but Defendants did not take any action. [*See* Filing No. 121-6 at 11; Filing No. 138-2 at 57.] Approximately six months passed, then Dr. Demetris became involved in AV's care. AV was hospitalized at the request of her parents in early June and, although she was covertly videotaped during her stay, and Dr. Demetris expressed concern regarding her symptoms not being visible on the videotape, AV was discharged to the care of her parents. [Filing No. 138-12 at 13.] Another hotline call was placed to DCS at the direction of Dr. Demetris on June 12, 2013, and the report from that call also indicated that AV was not in immediate danger of serious bodily injury. [Filing No. 138-3 at 1.] Five more days passed before the June 17, 2013 Care Conference and AV's removal from the VanWinkle home later that day.

The Court is mindful that the actual beliefs of Ms. Nichols and Ms. Miller regarding whether AV was in imminent danger are not the correct focus – rather, the Court must determine whether a reasonable caseworker would have thought that AV was in imminent danger. To that end, the Court finds it significant that Defendants do not point to any evidence indicating a change in AV's circumstances from June 12, 2013 (or even from her hospitalization in early June 2013) to her removal from the VanWinkle home on June 17, 2013. To be sure, the Care Conference on June 17, 2013 illuminated the extent of concern regarding AV's care to date, but Defendants have

not presented evidence that specific information they learned during that time period created imminency. Additionally, the very nature of the type of alleged abuse here – medical child abuse – could support a finding that a reasonable caseworker would not have believed that AV was in imminent danger. Medical child abuse requires the participation of a medical professional to treat the child for a condition from which he or she may not actually suffer, and there is no evidence that AV was scheduled for a medical procedure within the coming days or any type of medical intervention. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240-41 (10th Cir. 2003) (finding that there was not an immediate need to protect the child where parent had exhibited signs of medical child abuse, and stating "Defendants were aware that various doctors had suspected that [the child] was a victim of [medical child abuse] for quite some time, and the record indicates that there was nothing particularly unusual about [the child's] condition at the time he was removed").

The Court finds that there are genuine issues of material fact as to whether a reasonable person would believe that AV was in imminent danger when Ms. Nichols and Ms. Miller removed her from the VanWinkle home without a court order. Accordingly, Defendants' Motion for Summary Judgment as to qualified immunity for AV's Fourth Amendment claim is **DENIED**.

### 2. *Fourteenth Amendment Substantive Due Process Claims*

The Court notes at the outset that it is not entirely clear which Plaintiffs are asserting Fourteenth Amendment substantive due process claims. Plaintiffs state in their response brief, however, that "[t]he Plaintiffs' substantive due process claim is brought by the parents, Derek and Stacey, for the violation of their constitutional right to familial relations with their daughters due to their initial seizure on June 17, 2013 and the 23 days of detention that followed." Further, they concede that "the claims of MV and AV for this conduct are protected by the Fourth Amendment."

[Filing No. 143 at 21.] The Court agrees. *See Stop the Beach Renourishment, Inc. v. Florida Dept. of Envtl. Prot.*, 560 U.S. 702, 721 (2010) (where a particular amendment "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claims") (citation and quotation omitted). While the Fourth Amendment provides MV and AV with claims related to their initial seizure, it would not support claims for their continued 23-day detentions. Plaintiffs, however, appear to only allege claims based on the 23-day detention period on behalf of Stacey and Derek VanWinkle. [*See* Filing No. 143 at 21.] Accordingly, the Court will consider the substantive due process claim to be brought only by Stacey and Derek VanWinkle on their own behalf.

Defendants address three time periods in connection with the substantive due process claim – the initial removal, the continued detention, and "substantiation." [Filing No. 122 at 23-26.] Defendants argue, however, that "[t]he substantiation claims are really just restatements of the substantive due process claims premised on the initial removal and continued detention." [Filing No. 122 at 26.] Plaintiffs do not address these three time periods separately, but generally argue that there are issues of fact regarding whether Defendants had definite and articulable evidence giving rise to a reasonable suspicion that MV and AV had been abused or were in imminent danger of abuse. [Filing No. 143 at 21-26.] The Court will treat the initial removal of MV and AV separately from their continued detention, but will treat "substantiation" – which it interprets to mean Defendants' continued pursuit of the investigation – as part of the continued detention time period.

### a. Initial Removal of MV and AV

#### i.     Whether the Right Was Clearly Established

The Due Process Clause of the Fourteenth Amendment provides that the government shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The Seventh Circuit Court of Appeals reiterated in 2000 in *Brokaw* that "[t]he Supreme Court has long recognized as a component of substantive due process the right to familial relations." *Brokaw*, 235 F.3d at 1018 (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Additionally, it articulated in *Brokaw* that while the right to familial relations is not absolute, the Government only has an interest in protecting children from their parents where the Government "has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019 (citation omitted). In the context of removing a child without a court order, the "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Hernandez*, 657 F.3d at 475 (quoting *Siliven*, 635 F.3d at 927). For Stacey and Derek VanWinkles' substantive due process claim in connection with MV's and AV's removal from the VanWinkle home, the Court finds that the contours of the law were clearly established.

#### ii.     Whether There Was a Constitutional Violation

Defendants argue that Stacey and Derek VanWinkles' substantive due process claim related to the initial removal of MV and AV from the VanWinkle home rises and falls with the success of MV's and AV's Fourth Amendment claim and that, since Defendants had probable

cause to seize MV and AV, the Fourteenth Amendment due process claim fails as well. [Filing No. 122 at 24.]

In response, Plaintiffs rely on much of the same evidence discussed in connection with their Fourth Amendment claim, and argue that there are genuine issues of fact regarding whether the Defendants had definite and articulable evidence giving rise to a reasonable suspicion that MV or AV had been abused or were in imminent danger of abuse. [Filing No. 143 at 22-26.]

Defendants reiterate their arguments on reply.

With regard to MV, as discussed above, very little evidence existed at the time of MV's removal regarding her medical treatment, and genuine issues of fact exist which make it impossible to conclude as a matter of law that Ms. Nichols and Ms. Miller had probable cause to remove MV from the VanWinkle home. Defendants' Motion for Summary Judgment is **DENIED** as to Stacey and Derek VanWinkles' substantive due process claim for the removal of MV from their home.

Also as discussed above, there was probable cause to believe that AV was in some danger of abuse from Stacey VanWinkle, even if it was not imminent.[11] There is little to no evidence, however, regarding Derek VanWinkles' involvement in AV's medical care – for example, whether there were instances where Derek VanWinkle allegedly exaggerated AV's symptoms or sought medical treatment for her. Rather, the vast majority of the physicians who expressed concern regarding AV's care only mentioned Stacey, and not Derek. [*See, e.g.*, Filing No. 138-4 at 13 (Occupational Therapist Ms. Harris not mentioning Derek VanWinkle, and stating that "she was

---

[11] Plaintiffs argue that some of AV's physicians denied making statements that Defendants attributed to them, that Stacey VanWinkle denied telling Dr. Maisel that AV had been "vomiting up 'liters,' 'multiple times a day,'" and that a home healthcare nurse observed AV vomiting seven or eight times in an hour. [Filing No. 143 at 24.] As discussed more thoroughly in connection with the procedural due process claim below, the Court finds that even assuming these inconsistencies exist, there is still substantial uncontested evidence which would lead to a reasonable suspicion that AV was being abused, or would be abused, by Stacey VanWinkle.

not present when Ms. Vanwinkle discovered [AV] had been assessed, but was informed that Ms. Vanwinkle denied much of the report and [AV's] capabilities, wanting the report amended by the hospital"); Filing No. 138-4 at 13 (Physical Therapist Ms. Klene not specifically mentioning Derek VanWinkle and stating "she attempted to complete an evaluation with the child twice while in the hospital last week during her scheduled inpatient stay, and both times, mother immediately told her that [AV] has autism and would not speak with her"); Filing No. 138-4 at 14 (Dr. Maisel discussing only symptoms reported by Stacey VanWinkle, and not mentioning Derek VanWinkle).] As to Derek VanWinkles' substantive due process claim, the Court finds that there are genuine issues of fact regarding whether AV had suffered, or would suffer, any abuse at the hands of Derek VanWinkle.

In any event, also as discussed above, based on the nature of the alleged abuse and the actions of Ms. Nichols and Ms. Miller up to the date AV was removed from the VanWinkle home, there is a genuine issue of fact regarding whether a reasonable caseworker would have concluded that AV was in imminent danger. Accordingly, Stacey and Derek VanWinkles' substantive due process claim related to AV's initial removal from the VanWinkle home survives summary judgment and the motion is **DENIED** as to that claim.

### b. Continued Detention and Substantiation

#### i. Whether the Right Was Clearly Established

The Seventh Circuit discussed a substantive due process claim related to the continued detention of a child after removal in *Hernandez*:

> The issue is whether the defendants could have believed that continuing to hold [the child] in protective custody was lawful. Resolution of this issue turns on the facts and circumstances known to them at the relevant time. As they obtained additional information that eroded any reasonable basis for believing that [the child] was abused or was in imminent danger of abuse, keeping him in protective custody became unreasonable.

*Hernandez*, 657 F.3d at 479.

The law regarding a substantive due process claim for the detention of a child was generally established in June 2013, but the Court finds that it was not clearly established for the circumstances presented by this case. While it is true that Plaintiffs need not point to a case involving identical facts in order to show that their right was clearly established, the precedent Plaintiffs rely upon must still establish the unconstitutionality of the conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (To defeat a qualified immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question beyond debate"); *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000).

Here, the Court finds it particularly significant that Ms. Nichols and Ms. Miller obtained a court order – after a hearing at which the VanWinkle's participated in person and by counsel – just two days after removing MV and AV from the VanWinkle home, and that the Marion Superior Court found that the continued detention of MV and AV at that time was "necessary to protect the child(ren)." [Filing No. 121-12 at 9.] Plaintiffs have not pointed to any Seventh Circuit cases – or cases outside of the Seventh Circuit – discussing the implications of obtaining a court order and whether that protects Ms. Nichols and Ms. Miller from liability related to the continued detention of MV and AV. Accordingly, the Court finds that the right at issue in Stacey and Derek VanWinkles' substantive due process claim as it relates to the time period after Ms. Nichols and Ms. Miller obtained the June 19, 2013 court order was not clearly established at that time, because a reasonable official might not have known that the conduct at issue was unlawful. *Ziglar*, 137

S.Ct. at 1850. Ms. Nichols and Ms. Miller are entitled to qualified immunity for that claim, and their Motion for Summary Judgment is **GRANTED**.[12]

### 3. Fourteenth Amendment Procedural Due Process Claim

The Fourteenth Amendment procedural due process claim appears to be brought on behalf of all Plaintiffs and is based on two time periods – MV's and AV's removal from the VanWinkle home without a court order, and the continued pursuit of the investigation into, or "substantiation" of, neglect. The Court addresses each time period in turn.

#### a. **Removal Without a Court Order**

##### i. Whether the Right Was Clearly Established

The analysis of a procedural due process claim is two-fold – the Court must consider: (1) "whether the defendants deprived the plaintiff of a protected liberty or property interest"; and (2) if so, "what process was due." *Brokaw*, 235 F.3d at 1020 (citing *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996)). As noted above, the Supreme Court has recognized a liberty interest in familial relations. *See, e.g.*, *Santosky*, 455 U.S. at 753. The Seventh Circuit Court of Appeals has instructed that, in the context of a procedural due process claim, "governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances." *Brokaw*, 235 F.3d at 1020. After *Brokaw*, the Seventh Circuit acknowledged in *Hernandez* that some of its decisions contained ambiguous language or were otherwise unclear regarding the procedural due process analysis for removing a child from his or her home without a court order. *Hernandez*, 657 F.3d at 485-86 (finding that law

---

[12] Because the Court finds that the right at issue in the substantive due process claim related to the continued detention of MV and AV and the substantiation of the investigation was not clearly established, it need not consider whether the alleged activity constituted a constitutional violation. *See Pearson*, 555 U.S. at 236.

was not clearly established regarding procedural due process rights when child is removed from home without a court order).  The Seventh Circuit then clarified in *Hernandez* that "[w]hen read together, our cases such as *Brokaw* and *Jensen*, imply that government officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse…. It does not suffice for the official to have probable cause merely to believe that the child was abused or neglected, or is in a general danger of future abuse or neglect.  The danger must be imminent, or put another way, the circumstances must be exigent." *Id.* at 486.

The Court finds that the law was clearly established in 2013 regarding what procedural due process was required when Ms. Nichols and Ms. Miller removed MV and AV from their home without a court order.  Specifically, Ms. Nichols and Ms. Miller were on notice that they needed probable cause to believe MV and AV were in "imminent danger of abuse" before they could remove the children without a court order.

ii.     Whether There Was a Constitutional Violation

Defendants argue that a procedural due process claim related to the removal of MV and AV without a court order fails for the same reasons that MV's and AV's Fourth Amendment claim fails – that they had probable cause to believe there was impending harm.  [Filing No. 122 at 27.]

In response, Plaintiffs reference their arguments in support of the Fourth Amendment claims and state that "there are numerous facts that present a genuine issue as to whether exigent circumstances or imminent danger existed." [Filing No. 143 at 27.]

On reply, Defendants reiterate their arguments.

The Court has already considered whether undisputed evidence indicates that Ms. Nichols and Ms. Miller had probable cause to believe that MV and AV were in imminent danger when

they removed the girls from their home without a court order. Consistent with the Court's discussion above, the Court finds that genuine issues of fact exist regarding whether a reasonable caseworker would believe that MV and AV were in imminent danger when they removed the girls from their home. Further, the Court again notes the limited evidence regarding danger to MV, and any danger at all to either child at the hands of Derek VanWinkle. Defendants' Motion for Summary Judgment as to Plaintiffs' Fourteenth Amendment procedural due process claim related to the removal of MV and AV without a court order is **DENIED**.

### b. Substantiation

#### i. Whether the Right Was Clearly Established

The crux of Plaintiffs' procedural due process claim related to the substantiation of the allegations against Stacey and Derek VanWinkle is their allegation that Defendants misrepresented facts in order to obtain the June 19, 2013 court order. The Seventh Circuit Court of Appeals stated in *Brokaw* that "no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020. The Seventh Circuit in *Hernandez* reiterated this principle. Significantly, it does not appear that either *Brokaw* or *Hernandez* involved a situation where, as here, the plaintiff accused defendants of misrepresenting facts to obtain a court order, but had participated in a hearing before the court order was issued while represented by counsel.

In 2008, however, Judge Hamilton considered whether the father of a child who had been removed from his home stated a procedural due process claim where the father had notice and an opportunity to be heard, and was represented by counsel at the post-deprivation hearing, but alleged that defendants provided false information to the court at the hearing. *McHugh v. Indiana Family and Social Services Admin.*, 2008 WL 2225638, *13 (S.D. Ind. 2008). The court found

that "[t]he *Brokaw* court…held that allegations that the defendants had deliberately provided false information at the post-deprivation hearing stated a claim for a procedural due process violation," but found that the misrepresentations at issue did not support a procedural due process claim because some of the statements were not misrepresentations, some of the misrepresentations did not relate to material facts, plaintiff had not "come forward with evidence that would allow a jury to find that any defendant deliberately misled the court," and plaintiff and his attorney "had ample opportunity to clarify or correct any misstatement that might have been made" concerning one of the misstatements. *Id.* at *14 ("After that initial removal, the state court proceedings provided [plaintiff] with all the process that might have been due. [Plaintiff] was given notice of all key steps, and he was given ample opportunity to be heard. He appeared both in person and with counsel at multiple hearings on [the child's] status. The courts heard his testimony and arguments. For purposes of summary judgment, the court again assumes that the state courts erred by not giving custody of [the child] to [plaintiff] almost immediately, but an erroneous state court decision is not a violation of the federal due process clause").

These cases indicate that the right to a post-deprivation hearing with notice and with the assistance of counsel was clearly established in June 2013. But the right to more process than a hearing while represented by counsel when Defendants allegedly misrepresent facts in connection with the hearing was not clearly established at the time of the June 19, 2013 hearing – *i.e.*, a reasonable official might not have known that the conduct at issue violated the law. *Ziglar*, 137 S.Ct. at 1850. In any event, however, the Court discusses below the impact, if any, the alleged misrepresentations have on Plaintiffs' procedural due process claim.

ii.     Whether There Was a Constitutional Violation

Defendants argue that Plaintiffs' procedural due process claim fails as to the substantiation of abuse because "[t]he assessment and substantiation of abuse was reviewed by the applicable administrative process," and "Plaintiffs were given an opportunity to be heard in a meaningful time and place as provided in applicable state law and administrative rules." [Filing No. 122 at 28.]

Plaintiffs argue in response that Ms. Nichols made several misrepresentations in her Intake Officer's Report of Preliminary Inquiry and Investigation, and so there are genuine issues of fact regarding their procedural due process claim. [Filing No. 143 at 27-29.]

In their reply, Defendants argue that the facts Plaintiffs claim were misrepresented were not critical, and some of the statements were not misrepresentations at all. [Filing No. 149 at 7-9.]

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Here, the Marion Superior Court held a hearing two days after the removal of MV and AV from the VanWinkle home. The June 19, 2013 court order indicates that Stacey and Derek VanWinkle were given notice of the hearing, that Stacey VanWinkle retained an attorney who spoke at the hearing, and that Derek VanWinkle was represented by a public defender. [Filing No. 121-12.] At the July 10, 2013 hearing that was part of the CHINS proceeding, both Stacey and Derek VanWinkle were represented by the same attorney, and that attorney advised that the parents were "willing to work with homebased and therapy." [Filing No. 138-5 at 2.] The court ordered that MV and AV be released to the custody of their parents, and their detention ended on July 10, 2013.

It is hard to imagine what more process could have been provided to Stacey and Derek VanWinkle once MV and AV were removed from their home. They were both notified of the June 19, 2013 hearing, both had an opportunity to retain counsel, Stacey VanWinkle did retain counsel and he spoke during the June 19, 2013 hearing, both had notice of the July 10, 2013 hearing and had an opportunity to be represented by counsel, and both were represented by counsel at the July 10, 2013 hearing (who spoke on their behalf). To the extent Plaintiffs allege they are entitled to a hearing that is free from misrepresentations, the Court considers the context and substance of the misrepresentations noted by Plaintiffs.

The document in which the alleged misrepresentations appear is a twenty-seven page, single-spaced Intake Officer's Report of Preliminary Inquiry and Investigation (the "Report") that was presented to the Marion Superior Court at the June 19, 2013 post-deprivation hearing. The first alleged misstatement that appears in the Report is that "[d]ue to the imminent health and psychological risk for the children in the home, and based on multiple physicians reporting medical concerns that required immediate attention, the children were removed from the care of their parents, and placed in custody." [Filing No. 121-8 at 9.] Even if it was not accurate to say that multiple physicians reported medical concerns that required *immediate* attention, Plaintiffs have not presented any evidence that the statement was critical to the Marion Superior Court's decision. It is also noteworthy that this summary sentence in the Report is followed by the medical providers' actual statements and opinions.

The second alleged misstatement that appears in the Report is a summary of a report Dr. Demetris provided to the Family Case Manager which purportedly listed diagnoses, procedures, and symptoms "with no medical evidence and/or testing that supported the reported symptoms." [Filing No. 121-8 at 18.] While Plaintiffs point to six procedures AV underwent and argue that

the procedures or tests "supported the reported symptoms," [Filing No. 143 at 27-28], the Report outlined many symptoms not covered by those procedures or tests.

Third, Plaintiffs point to statements by Dr. Demetris, Dr. Hainline, and Dr. Hamaker that they later contradicted in their depositions. [*See* Filing No. 143 at 28-29.] It is important to recognize that the Report also contains numerous statements from those same medical providers which Plaintiffs do not contend are inaccurate, and which support the Marion Superior Court's conclusion that removal of MV and AV was necessary. Additionally, the Report contains pages and pages of statements from other medical providers – including Occupational Therapist Ms. Harris, Physical Therapist Ms. Klene, Dr. Sufi, Dr. Hibbard, Dr. Meadows, and Dr. Maisel, -- and AV's and MV's maternal grandmother, all of which support the decision to continue detention and none of which are disputed by Plaintiffs. Moreover, Plaintiffs have not presented any evidence suggesting that the alleged misstatements were deliberate or intentional, nor did they argue that their attorney did not have an opportunity to address the alleged misstatements. *See McHugh*, 2008 WL 2225638 at *14 (granting summary judgment in favor of defendants related to removal of child from home where plaintiff did not "come forward with evidence that would allow a jury to find that any defendant deliberately misled the court…[or] allow a reasonable jury to find that any defendant deliberately lied to the court").

While the Court does not condone misrepresentations in court filings, it finds that the alleged misrepresentations here do not support a procedural due process claim. They are but a small fraction when compared to the volume of evidence presented in the Report. Additionally, there is no evidence that the misstatements were intentional. Based on the process provided to Plaintiffs which, notably, ultimately resulted in the release of MV and AV to their parents, the Court finds that there was not a procedural due process violation in connection with the

substantiation of the allegations of abuse and **GRANTS** Defendants' Motion for Summary

Judgment on that claim.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART**

Defendants' Motion for Summary Judgment. [Filing No. 120.] The following claims remain:

- The Fourth Amendment claim asserted on behalf of MV and AV against Ms. Nichols and Ms. Miller;

- The Fourteenth Amendment substantive due process claim asserted by Stacey and Derek VanWinkle on their own behalf against Ms. Nichols and Ms. Miller and related to the initial removal of MV and AV from the VanWinkle home; and

- Plaintiffs' Fourteenth Amendment procedural due process claim against Ms. Nichols and Ms. Miller related to the initial removal of MV and AV from the VanWinkle home.

No partial final judgment shall issue. The Court requests that the Magistrate Judge confer with

the parties regarding possible resolution of this matter prior to the November 27, 2017 trial.



Date: 09/22/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana



**Distribution via ECF only to all counsel of record**